UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x
CHARLES C. WILLIAMS,                              :
                                                  :
                          Plaintiff,              :
                                                  :
            v.                                    :            24-cv-1336 (SFR)
                                                  :
CITY OF HARTFORD, ET AL.,                         :
                                                  :
                          Defendants.             :
---------------------------------------------------------------- x

**MEMORANDUM & ORDER**

In his Amended Complaint, Plaintiff Charles Williams alleges, *inter alia*, that the City

of Hartford and some of its employees violated his right to due process by failing to disclose

exculpatory evidence in a state trial that resulted in his wrongful conviction. Defendant City

of Hartford moved to dismiss Counts 6, 8, and 9 of the Amended Complaint under Fed. R. Civ.

P. 12(b)(6). Defendants Cheryl Gogins, Philip Fuschino, Manuel Pacheco, Dom Agostino,

Andrew Weaver, and Terry Waller moved to dismiss Williams' other claims. At oral argument,

Williams withdrew Counts 5 and 8 of the Amended Complaint. For the reasons set forth below,

I deny the Motions to Dismiss the remaining Counts.[1]

I.    **BACKGROUND**

      A.    **Factual Background**

      The following facts are accepted as true for the purpose of considering the Motions to

Dismiss.

---

[1] The individual Defendants' Motion to Dismiss adopts and mirrors the arguments in the City of
Hartford's Motion to Dismiss. *See* ECF No. 34-1.

1

### 1.    Relationship with Complainant

Williams was in a romantic relationship with an individual ("Complainant") for several years. Am. Compl., ECF No. 30, ¶ 15. In May 2012, Complainant learned Williams had started a relationship with another woman, and had a child with that woman, while Williams was still living with Complainant. *Id.* ¶¶ 15-16. Complainant subsequently "began a campaign of harassment" against Williams. *Id.* ¶ 19.

In June 2012, Complainant filed twelve false police reports against Williams with the Bloomfield Police Department in an attempt to falsely incriminate Williams for crimes that did not occur. *Id.* ¶ 20. In one such case, Complainant "staged a home invasion and burglary in an attempt to falsely incriminate [Williams] for a major crime," which a detective later determined was staged, resulting in "no-contact orders and protective orders." *Id.* ¶ 21. Nonetheless, Williams resumed a "consensual sexual relationship with the complainant" in January and February 2013. *Id.* ¶ 23.

In February 2013, Complainant asked Williams to "lie for her as a witness" in a state court case for "false reporting and false statements." *Id.* ¶ 24. When Williams refused, Complainant first told Williams that she was pregnant by him, and then "began making threats to put [Williams] in jail for the rest of his life." *Id.* ¶¶ 25-27. Near the end of February 2013, Complainant told Williams she was "dating 'a guy named Terry,' and that Terry was 'a high-ranking city [of Hartford] official." *Id.* ¶ 27 (alterations in original). On February 27, 2013, Williams ceased communication with the Complainant. *Id.* ¶ 28. On February 28, 2013, Complainant reported that she had been punched in the nose but did not identify Williams as her attacker. *Id.* ¶ 29.

### 2.    Investigation Against Williams

On March 6, 2013, Williams alleges that at Complainant's behest, Defendant Terry Waller, an employee of the Hartford Fire Department, called Williams' mother's home, and threatened that if Williams did not help Complainant, Waller would have Williams "set up by the Hartford police and harassed non-stop." *Id.* ¶¶ 9, 30. At around the same time, Complainant "sent [Williams] a Facebook message." *Id.* ¶ 31. Williams reported "this incident" to the Hartford Police Department ("HPD"), where HPD Officer Dom Agostino received the report, "did nothing with the report, and responded negatively to [Williams]." *Id.* ¶¶ 8, 32-33. When Williams "appeared in-person at the police station," Agostino refused to take the phone number of the hostile call and told Williams to leave or face arrest. *Id.* ¶ 34.

Williams alleges that at some point, "Waller told someone in the Hartford Police Department that he had a situation he needed help with" and that "[C]omplainant needed protection from [Williams]"; Waller was subsequently informed that Defendant Cheryl Gogins (of the HPD) "had been assigned to the investigation," presumably against Williams (which "investigation" is not clear from the pleadings). *Id.* ¶¶ 8, 36.

### 3.    April 24 Sworn Statement and August 27 Report

On April 16, 2013, Gogins took a statement from Complainant identifying Williams as the person who punched her on February 28, 2013. *Id.* ¶ 37. She did not, at that point, accuse him of sexual assault or unlawful restraint. *Id.* On April 24, 2013, Complainant gave a detailed, seven-page sworn statement to Defendant HPD Officer Philip Fuschino about her relationship with Williams over the course of six years, which accused Williams of burglarizing her house on February 22, 2013 but included no allegations of sexual assault or violent restraint. *Id.* ¶¶ 8, 38-40. On August 12, 2013, Gogins submitted an arrest warrant application regarding the

alleged February 22 burglary to an Assistant State's Attorney, but the Assistant State's Attorney refused to sign it. *Id.* ¶ 42. On August 27, 2013, Gogins filed a report noting that, although Complainant had initially claimed she would provide video evidence supporting her burglary allegations against Williams, Complainant had not provided the video evidence she promised. *Id.* ¶ 43. Gogins was aware of Complainant's history of false reporting and her recent arrest for false statements and false reporting. *Id.* ¶¶ 47-48.

On September 20, 2013, Complainant provided a statement to Gogins that for the first time accused Williams of raping her on February 14, 2013. *Id.* ¶ 44. Williams alleges that Gogins "was aware" that there was no corroborating evidence, that Complainant had gone to Hartford Hospital on February 28, 2013, and that "there were medical records likely to contain potentially exculpatory information," but either chose not to procure those records or disregarded them. *Id.* ¶¶ 45-46. Instead, Gogins procured medical records from Complainant's abortion at Middlesex Hospital in which Complainant reported that she had learned of her pregnancy on March 20, 2013 and claimed it was a result of sexual assault on February 14, 2013. *Id.* ¶ 49.

In April 2014, Gogins procured fetal DNA from the abortion and on April 25, 2014, after obtaining a warrant, went with Defendant HPD Officer Manuel Pacheco "and a number of Department of Correction officials" to obtain a DNA swab from Williams "by force." *Id.* ¶¶ 8, 51-52. On July 16, 2014, forensic results indicated that Williams "cannot be eliminated" as the father. *Id.* ¶ 53.

### 4. Arrest Warrant, Trial, and Exoneration

On July 17, 2014, Gogins sought an arrest warrant for Williams. Williams alleges the arrest warrant application "contained many omissions of material facts," including omitting

reference to the April 24 statement, omitting reference to the uncorroborated burglary accusation (and the prosecutor's refusal to sign the arrest warrant application for burglary because of doubts about the Complainant's credibility), and omitting Complainant's history of false reporting (including her arrest and prosecution for false reporting). *Id.* ¶ 54. Williams alleges also that the arrest warrant application contained a false statement that the DNA report affirmatively determined that Williams *was* the father. *Id.* ¶ 55. Defendant Andrew Weaver of the HPD, Gogins' supervisor, signed the arrest warrant application and "joined in its transmission to the State's Attorney's Office." *Id.* ¶ 8, 57.

On July 21, 2014, a state judge signed the arrest warrant and found probable cause. *Id.* ¶ 58. The arrest warrant was served on Williams on July 29, 2014, and he was put on trial for two counts of sexual assault in the first degree and one count of unlawful restraint in the first degree in December 2014. *Id.* ¶ 59-60. Williams alleges that the April 24, 2013 sworn statement made by the Complainant to Defendant Fuschino, which did not include allegations of sexual assault or unlawful restraint, and the August 27, 2013 police report by Gogins, which noted Complainant's failure to corroborate her burglary report, were exculpatory evidence and were withheld by the HPD from the prosecutors and the defense. *Id.* ¶ 61-62.

Williams was found not guilty of sexual assault but guilty on the charge of unlawful restraint; he then pleaded guilty to "being a persistent serious felony offender," based on the unlawful restraint conviction, and received a ten-year prison sentence. *Id.* ¶¶ 63-65. Williams' sentence was vacated on August 22, 2023 by the Connecticut Appellate Court, which held that the suppression of the April 24 sworn statement was a *Brady* violation and remanded the case. *Id.* ¶ 66; *see Williams v. Comm'n of Corr.*, 301 A.3d 1136, 1154 (Conn. App. 2023) ("[W]e disagree with the habeas court's conclusion that the petitioner did not meet his burden of

demonstrating that [the April 24 statement] was material under *Brady*. . . . [B]ecause [the statement] could have significantly undermined the victim's testimony on a critical issue in the case, there is a reasonable probability that, had the state disclosed [the statement], the outcome of the petitioner's criminal trial would have been different.").[2]

Williams also alleges that the HPD "has a longstanding custom and practice of withholding exculpatory evidence in serious felony cases," and this pattern of *Brady* violations has "led to the wrongful convictions of numerous innocent men in Hartford, Connecticut, including Donald Raynor, Miguel Roman, Alfred Swinton, Hubert Thompson, Derrick Taylor, and James Tillman." Am. Compl. ¶ 2. He further argues that the City of Hartford had actual or constructive notice of this pattern of misconduct after a 2011 audit of the HPD Internal Affairs Division, conducted by an external consultant, found widespread failures including "missing case files, improper documentation practices, and failure to develop a written policy and production protocol for *Brady* materials," and that Hartford failed to correct these deficiencies by adopting corrective policies or adequately training or supervising officers. *Id.* ¶ 68.

### B. Procedural History

Williams filed his Complaint on August 20, 2024. ECF No. 1.[3] Defendant City of Hartford filed its Motion to Dismiss on January 17, 2025. ECF No. 29. Williams then filed an Amended Complaint on February 7, 2025. Am. Compl., ECF No. 30.

---

[2] The habeas trial court found, and respondent did not challenge on appeal, that the April 24 statement had been suppressed. *Williams*, 301 A.3d at 1143-44.

[3] This case was first assigned to the Honorable Judge Vernon D. Oliver, and was transferred to the Honorable Judge Kari A. Dooley, before it was transferred to me on January 6, 2025. ECF Nos. 17-18, 28.

The City of Hartford filed a Supplemental Memorandum in Support of its Motion to Dismiss on February 20, 2025, addressing new allegations in the Amended Complaint. ECF No. 33. The Individual Defendants filed their Motion to Dismiss on March 17, 2025, which was directed at the Amended Complaint. ECF No. 34. Williams filed a Memorandum in Opposition to the Motions to Dismiss on April 25, 2025. ECF No. 38. The City of Hartford filed its Reply to that Opposition on May 8, 2025. ECF No. 39.

On January 22, 2026, I held oral argument on the Motions to Dismiss. ECF No. 48.[4]

## II.  <u>LEGAL STANDARD</u>

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018); *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155 (D. Conn. 2016). Although this "plausibility" requirement is "not akin to a probability requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. I must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). However, I am not bound to accept "conclusory

---

[4] At oral argument, counsel for the Individual Defendants conceded that they were abandoning their qualified immunity claims with respect to Counts 1, 2, and 3 at this stage of the proceedings, after Williams amended his Complaint to allege that the Individual Defendants failed to share exculpatory information with the prosecutor. Williams provided notice at oral argument that he was voluntarily withdrawing Counts 5 and 8. I therefore do not address Defendants' arguments with respect to Counts 5 and 8.

allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

## III.   DISCUSSION

Defendants seek to dismiss the entire Amended Complaint on the grounds that Williams' previous conduct in related litigation bars this action via the doctrine of unclean hands, and separately that this action is barred by *res judicata*. They further argue that Counts 1 through 5 should be dismissed on qualified immunity grounds; that Williams failed to state a claim for municipal liability under *Monell* in Count 6; that Williams failed to comply with the statutory requirements for indemnification in Count 8; and that Williams has failed to state a claim against the City of Hartford for statutory negligence in Count 9.[5] Defendants do not individually challenge Count 7.

### A.   Unclean Hands

Defendants argue that Williams' conduct in a previous and related case in this District, which the Court dismissed after Williams falsified a document and lied to the court about doing so, entirely bars his claims in this case under the doctrine of unclean hands. ECF No. 29-1, at 6-8; ECF No. 34-1, at 4.

"The doctrine of 'unclean hands' closes off access to equitable relief for 'one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.'" *CUMIS*

---

[5] Defendants also argued that Williams' claims for punitive damages against the City of Hartford were barred under § 1983. ECF No. 29-1, at 25 (citing *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 259-61 (1981)). Williams then amended his Complaint to eliminate his claims for punitive damages against the City of Hartford. Am. Compl. 21. I therefore do not address this argument.

*Specialty Ins. Co. v. Kaufman*, No. 21cv11107 (DLC), 2022 WL 4534459, at *4 (S.D.N.Y. Sept. 28, 2022) (citing *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009)). The doctrine of "[u]nclean hands is an equitable defense to equitable claims." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005).[6] Where a plaintiff "seeks damages in an action at law, [a defendant] cannot avail itself of unclean hands as a defense." *Id.*; *accord CUMIS Specialty Ins. Co.*, 2022 WL 4534459, at *4.

Here, Williams seeks only damages. Am. Compl. at 25. Thus, Defendants cannot avail themselves of unclean hands as a defense. Moreover, even if Defendants could properly raise an unclean hands defense,

> [Courts] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933) (citations omitted).

---

[6] Some courts have applied the doctrine of unclean hands beyond the equity context to suits at law. *See Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 106 (D. Md. 1989) (stating that "[a]lthough the maxim originated in courts of equity, it now extends to actions at law" and is "referr[ed] to as equitable estoppel") (citing *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 n.8 (4th Cir. 1969)). The Second Circuit has rejected the application of the unclean hands doctrine as a defense to suits seeking damages. *See Alonso Vazquez v. Azoulay*, 834 Fed. App'x 653, 655 ("[T]he doctrine of unclean hands applies when parties seek equitable relief, not damages.") (summary order) (citing *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004)). Defendants rely on *Goldstein v. Delgratia Min. Co.*, 176 F.R.D. 454, 458 (S.D.N.Y. 1997), which was decided before the Second Circuit cases cited here. *Goldstein* discusses the unclean hands doctrine in denying a motion for voluntary dismissal by a plaintiff in a class action damages suit in light of his misrepresentations to the court. *Goldstein* does not specifically address whether the unclean hands doctrine applies outside of the equity context.

To claim unclean hands, Defendants would need to show that Williams' actions in the prior lawsuit have prejudiced Defendants with respect to this litigation. Here, Defendants have not shown how they are prejudiced in *this* litigation by Williams' conduct in the prior action. Defendants argue that Williams' fraud on the court should, in effect, be a bar on any action arising out of the events at issue in that earlier case. But Williams' misconduct related to that case, and he was sanctioned for it when the court dismissed the previous action because of his fraud on the court. *See Williams v. Hartford Police Dep't,* No. 3:15-CV-933 (AWT), 2018 WL 8731546, at *4 (D. Conn. Aug. 14, 2018). The sanction did not purport to extend to future cases. Williams' fraud on the court involved altering a civilian complaint that he attached as an exhibit and then lying about doing so under oath. That exhibit is not at issue in the present case. The fraud was uncovered and Defendants have failed to explain how it impacts the litigation of this case. Accordingly, even if the unclean hands doctrine were available to Defendants, it does not bar Williams' claims here.

Accordingly, I deny Defendants' Motion to Dismiss as it relates to the doctrine of unclean hands.

### B.    *Res Judicata*

Defendants also argue that the entire Amended Complaint should be dismissed on *res judicata* grounds. They point out that Williams has already sued many of these parties on claims arising from the same underlying set of facts, twice, and argue that Williams should therefore be precluded from bringing effectively the same claim again. ECF No. 29-1, at 8-10. They also argue that Williams became aware of the exculpatory information at issue in this case during the earlier litigation and could have raised the issue of the *Brady* violations at that time. *Id.* at 10. Williams counters that this "case is not barred by *res judicata* because it does

not seek to relitigate the same claims" as the earlier cases and indeed Williams could not have brought the claims in this action before his convictions were vacated, pursuant to the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). *See* ECF No. 38, at 8.

Under the doctrine of *res judicata*, also called claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). The Second Circuit has held that

> the doctrine bars later litigation if an earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action. . . .
>
> *Res judicata* is a rule of fundamental repose important for both the litigants and for society. It relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication.

*EDP Med. Comput. Sys., Inc. v. U.S.*, 480 F.3d 621, 624 (2d Cir. 2007) (internal quotation marks, citations, and brackets omitted). "Suits involve the same claim (or 'cause of action') when they arise from the same transaction, or involve a common nucleus of operative facts." *Cayuga Nation v. Tanner*, 6 F.4th 361, 375 (2d Cir. 2021) (internal quotation marks omitted).

Although *res judicata* is an affirmative defense, *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999), it may be raised on a motion to dismiss under Rule 12(b)(6), if it is "clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law," *Conopco, Inc. v. Roll Int'l.*, 231 F.3d 82, 86 (2d Cir. 2000).

However, under the principles of *res judicata*, "while a previous judgment may preclude litigation of claims that arose prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Ljutica v. Holder*, 588 F.3d 119, 127 (2d Cir. 2009) (internal quotation marks omitted).

Williams' claims in this case are § 1983 claims based upon an alleged *Brady* violation that, Williams asserts, led to his unconstitutional conviction for unlawful restraint. ECF No. 38, at 8. The core allegation in the Amended Complaint is that that Hartford Police Officers did not give to prosecutors exculpatory evidence, as required by *Brady v. Maryland* and its progeny.

Although, as Defendants observe, these facts were available to Williams during the course of his previous suits, ECF No. 29-1, at 9-10, he could not, as a matter of law, have prevailed on these claims before his unlawful restraint conviction was overturned. Under the doctrine established by the Supreme Court in *Heck v. Humphrey*,

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

512 U.S. at 486-87. The Second Circuit has emphasized that, when evaluating whether a plaintiff's § 1983 claim is barred by *Heck*, the court must examine whether a judgment in favor of the plaintiff "would necessarily imply the invalidity of any conviction or sentence that might

have resulted from the prosecution of [plaintiff] resulting from the arrest." *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999) (internal quotation marks omitted).

In this context, the Second Circuit "has emphatically and properly confirmed that *Brady*-based § 1983 claims necessarily imply the invalidity of the challenged conviction in the trial (or plea) in which the *Brady* violation occurred." *Poventud v. City of New York*, 750 F.3d 121, 132-33 (2d Cir. 2014) (internal quotation marks omitted). "That should come as no surprise; the remedy for a *Brady* violation is *vacatur* of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to her." *Id.* at 133.

Williams' claims for relief stem from alleged *Brady* violations that resulted in an unconstitutional conviction for unlawful restraint. Under *Heck*, bringing *Brady*-based § 1983 claims before Williams' appeal was vacated would have been prohibited because it would have implied the invalidity of the challenged conviction. *See id.* at 132. Several Defendants in Williams' 2015 case argued that his claims were barred by *Heck*, an argument that the Court rejected because Williams' claims in the earlier action were premised on malicious prosecution for the sexual assault charges for which he was not convicted, retaliation, and various state law torts. *Williams v. Hartford Police Dep't*, No. 3:15-cv-933 (AWT), 2016 WL 11659354, at *2-3 (D. Conn. June 17, 2016). Williams' claims in the 2015 suit were not based on his wrongful conviction for unlawful restraint due to the alleged *Brady* violations. Similarly, when the Court dismissed Williams' claims in *Williams v. Hartford State's Att'ys Off.*, No. 3:18-cv-1700 (KAD), 2018 WL 5299711 (D. Conn. Oct. 25, 2018), Williams' unlawful restraint conviction

had not been vacated and he could not prevail on a § 1983 claim asserting an unconstitutional violation of *Brady*.[7]

In other words, Williams did not and could not have brought the current § 1983 *Brady* claims in his earlier cases, because his conviction for unlawful restraint had not yet been invalidated. These previous judgments may not preclude the litigation of claims which did not exist at the time of the judgments and "which could not possibly have been sued upon in the previous case[s]." *Ljutica*, 588 F.3d at 127.

Because Williams could not have brought these claims in the earlier proceeding, they are not precluded by *res judicata*. I therefore deny Defendants' Motion to Dismiss on the basis of *res judicata.*

## C.    Count 4: Qualified Immunity

Defendants seek dismissal of Count 4 against the Individual Defendants on the basis of qualified immunity.[8] Qualified immunity applies in the § 1983 context when an official's challenged actions were taken in the course of their official duties while performing discretionary functions. S*ee Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Immunity attaches only "insofar as [the officer's challenged] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (quoting *Harlow*, 457 U.S. at 818).  As such, the doctrine "provide[s] ample protection to all but the plainly incompetent or those who knowingly violate

---

[7] Williams case in 2018 was dismissed at the initial review stage—thus prior to service on the defendants and without the opportunity for briefing from Williams. *See Williams*, 2018 WL 5299711, at *1-2.

[8] See supra note 4.

the law." *Wiggins v. Griffin*, 86 F.4th 987, 994 (2d Cir. 2023) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Second Circuit engages "in a two-step inquiry to determine whether qualified immunity is appropriate. Qualified immunity applies unless (1) the official violated the plaintiff's statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct." *Eaton v. Estabrook*, 144 F.4th 80, 90 (2d Cir. 2025) (internal quotation marks omitted).

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing violates that right." *Linton*, 135 F.4th at 32 (alterations omitted and internal quotation marks omitted). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk County, New York*, 17 F.4th 342, 367 (2d Cir. 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)).

"While qualified immunity may be 'successfully asserted' on a motion to dismiss the complaint, the defense 'faces a formidable hurdle' at the pleading stage." *Horn v. Stephenson*, 11 F.4th 163, 169-70 (2d Cir. 2021) (citing *McKenna v. Wright*, 386 F.3d 432, 434-35 (2d Cir. 2004)). "For qualified immunity to bar suit at the motion to dismiss stage, '[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Birch v. Town of New Milford*, No. 3:20-cv-1790 (VAB), 2021 WL 4932405, at *10 (D. Conn. Sept. 24, 2021) (quoting *McKenna*, 386 F.3d at 436).

Defendants argue that Williams' Count 4, alleging failure to intervene by Defendants Fuschino, Pacheco, Agostino, and Weaver, should be barred by qualified immunity because Williams failed to plead sufficient facts explaining how each of these Defendants "had reason to know" of the wrongdoing alleged in the Amended Complaint, or "a realistic opportunity to intervene." ECF No. 29-1, at 22-23.

Defendants concede that "[i]t is well settled that 'all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens'—including the right to a fair trial—'from infringement by other law enforcement officers in their presence.'" ECF No. 29-1, at 22 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *See id*.

The Amended Complaint alleges that each of the officers knew of the *Brady* violations and did nothing to stop them. Defendants suggest that Williams must, at this stage, "plead sufficient facts as to each of the defendants named in this Fourth count, regarding how each had reason to know or a realistic opportunity to intervene." ECF No. 29-1, at 22-23. But "[f]or qualified immunity to bar suit at the motion to dismiss stage, '[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Birch*, 2021 WL 4932405, at *10 (quoting *McKenna*, 386 F.3d at 436).

That standard has been met here. According to the Amended Complaint, Agostino, Fuschino, Pacheco, and Weaver were all directly involved in the investigation of Williams.

Fuschino took the April 24 sworn statement; Weaver signed off on the arrest warrant application. Am. Compl. ¶¶ 38, 40, 57. Agostino received William's report that Complainant had been threatening to "set up" Williams via the Hartford Police and "did nothing with the report." *Id.* ¶ 33. Pacheco participated in the forced acquisition of a DNA swab from Williams based on an allegedly deficient warrant. *Id.* ¶ 52.

Any or all of these individuals might be shown at a later stage of the case to have been unaware of the violations or unable to intervene. But at this stage, taking all well-pleaded facts as true and drawing all inferences in Williams' favor, it does not appear that Williams "can prove no set of facts in support of his claim that would entitle him to relief." *Birch*, 2021 WL 4932405, at *10. Qualified immunity is therefore inappropriate at this stage, and I deny the Motion to Dismiss Count 4 on qualified immunity.

### D. Supplemental Jurisdiction

Because I do not dismiss Williams' federal claims, I need not address Defendants' argument that I ought to decline supplemental jurisdiction over Williams' state law claims. *See* ECF No. 29-1, at 26.

### E. Count 6: Municipal Liability

The City of Hartford seeks dismissal of Count 6, which alleges municipal liability. The Amended Complaint asserts that the Hartford Police Department has "a longstanding custom and practice of withholding exculpatory evidence in serious felony cases." Am. Compl. ¶ 2. According to the Amended Complaint:

> This unconstitutional pattern of violations of *Brady v. Maryland*, 373 U.S. 83 (1963) has led to the wrongful convictions of numerous innocent men in Hartford, Connecticut, including Donald Raynor, Miguel Roman, Alfred Swinton, Hubert Thompson, Derrick Taylor, and James Tillman. In each of these cases, as in Plaintiff's, HPD officers suppressed material evidence

favorable to the accused, resulting in innocent men being sent to prison for crimes they did not commit.

*Id.* ¶ 2. The Amended Complaint states further:

The City of Hartford had actual or constructive notice of this pattern of misconduct by HPD officers by virtue of a 2011 outside audit of the HPD Internal Affairs Division, which found widespread failures in the citizen complaint investigative process, violations of a federal consent decree, missing case files, improper documentation practices, and failure to develop a written policy and production protocol for *Brady* materials. Despite being on notice of these deficiencies that allowed serious misconduct like the suppression of exculpatory evidence to persist unchecked, the City of Hartford and HPD leaders deliberately chose not to implement the recommended reforms or take other necessary corrective action. The City failed to adopt policies requiring disclosure of exculpatory evidence, to adequately train and supervise officers on their *Brady* obligations, or to meaningfully investigate and discipline officers who commit such violations.

. . . .

As a direct and foreseeable consequence of the Defendant City of Harford's deliberate indifference and failure to adequately train, supervise and discipline its officers to prevent *Brady* violations and other unconstitutional withholding of exculpatory evidence, Mr. Williams was deprived of his liberty and suffered the additional injuries and damages set forth below.

Am Compl. ¶¶ 68, 70.

The City of Hartford argues that Williams' municipal liability claim should be dismissed because Williams' *Monell* allegations are too conclusory to survive a motion to dismiss. ECF No. 29-1, at 10-11; ECF No. 39, at 2-4.[9]

"A municipality or other local government may be liable under [42 U.S.C. § 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing

---

[9] Williams' Amended Complaints added new allegations relating to his *Monell* claim that were absent from his initial complaint. However, the City of Hartford asserts that the allegations are still too conclusory.

*Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 692 (1978)). But local governments are responsible only for their own illegal acts and are not vicariously liable under § 1983 for the actions of their employees. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986).

"Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick*, 563 U.S. at 60 (quoting *Monell,* 436 U.S. at 691). "Courts have recognized that '[a] plaintiff may satisfy the policy or custom prong in one of four ways: by alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.'" *Doe by & through Boyd v. Smereczynsky*, No. 3:16-cv-394 (MPS), 2017 WL 1100426, *2 (D. Conn. Mar. 23, 2017) (quoting *Aquino v. City of N.Y.*, No. 1:16-cv-1577-GHW, 2017 WL 384354, at *3 (S.D.N.Y. Jan. 25, 2017)).[10]

---

[10] The Second Circuit "has identified three requirements before a municipality's failure to train or supervise constitutes deliberate indifference": (1) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks omitted); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (stating that failure to train can satisfy *Monell*'s policy or custom requirement where "the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need").

Prior to *Twombly* and *Iqbal*, the Supreme Court rejected application of a heightened pleading standard for § 1983 claims against municipalities, stating that "all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993) (internal quotation marks omitted).

In *Thomas v. City of Galveston*, 800 F. Supp. 2d 826 (S.D. Tex. 2011), the court determined that with respect to claims against municipalities, "*Leatherman* and *Iqbal* may be reconciled, without allowing boilerplate allegations, on the one hand, or requiring plaintiffs to plead specific factual details to which they do not have access before discovery, on the other." *Id.* at 842.[11] The court concluded:

> [A] plaintiff suing a municipality must provide fair notice to the defendant, and this requires more than genetically restating the elements of municipal liability. Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy. Those types of details, or any other minimal elaboration a plaintiff can provide, help to "satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests," *Twombly*, 550 U.S. at 555 n.3, . . and also to "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 129 S.Ct. at 1950.

*Id.* at 843-44 (footnotes omitted); *Johnson v. Baltimore Police Dep't*, No. CV ELH-19-00698, 2020 WL 1169739, at *34 (D. Md. Mar. 10, 2020) (denying motion to dismiss *Monell* claim, stating: "In the context of *Monell* liability, it will often be the case that a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before

---

[11] The court observed that "[i]n the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Galveston*, 800 F. Supp. 2d at 843.

discovery. Although boilerplate allegations will not suffice, at the motion to dismiss stage, courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers."); *Est. of Osuna v. Cnty. of Stanislaus*, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019) (denying motion to dismiss *Monell* claim where plaintiff "identified multiple prior instances of alleged misconduct" and "alleges that these actions occurred due to either a lack of training, or a policy of employing excessive and unreasonable force," and stating that "[i]t is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated guesswork").[12]

To state a *Monell* claim, a complaint must do more than allege a single instance of misconduct by a municipal employee and assert in conclusory language a widespread practice or failure to properly train or supervise employees. *Ricciuti v. N.Y.C. Transit Auth*., 941 F.2d 119, 123 (2d Cir. 1991) "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy"). Here, however, the Amended Complaint alleges multiple separate instances in Williams' own prosecution of officers failing to provide exculpatory evidence to prosecutors. In particular, the Amended Complaint alleges that Gogins and Fuschino withheld the Complainant's April

---

[12] Prior to *Twombly* and *Iqbal*, the Second Circuit observed that "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004).

24, 2013 sworn statement despite knowing it was exculpatory.[13] Am. Compl. ¶¶ 71-76. Indeed, the Connecticut Appellate Court determined that this statement was exculpatory, material, and withheld from the defense. *Id.* ¶ 73. In addition, the Amended Complaint asserts that Gogins and her supervisor, Weaver, both had knowledge of the exculpatory nature of the August 27, 2013 police report and yet failed to give it to prosecutors. *Id.* ¶¶ 76-85.[14] Moreover, according to the Amended Complaint, in July 2014, Gogins and Weaver provided an application for an arrest warrant to the prosecutor's office that contained significant misrepresentations and omissions. *Id.* ¶¶ 54-59, 86-90. Thus, the alleged instances of misconduct involved three different officers, including a supervisor. The Amended Complaint also alleges awareness of the misconduct by two additional officers. *Id.*, p.19.

In addition to alleging that multiple officers (including a supervisor) were involved in multiple *Brady* violations in Williams' own prosecution, the Amended Complaint alleges that the HPD and the City of Hartford were on notice of the lack of oversight over officer misconduct as a result of a 2011 audit of the HPD Internal Affairs Division that "found widespread failures in the civilian complaint investigative process, violations of a federal consent decree, missing case files, improper documentation practices, and the failure to develop a written policy and production protocol for *Brady* materials." *Id.* ¶ 68. According to

---

[13] The Complainant's seven-page sworn statement described in detail Complainant's relationship with Williams over the course of six years and accused Williams of burglary of her home—but included no allegations of sexual assault or violent restraint. Am. Compl. ¶¶ 38-40

[14] The August 27 police report, authored by Gogins, revealed that the Complainant failed to corroborate her allegations of a burglary committed by Williams with video evidence, despite claiming to possess such evidence. Am. Compl. ¶ 78. The report, which made no mention of any sexual assault committed by Williams, would have also undermined the Complainant's claim that she was not comfortable disclosing the allegation to Gogins until September 2013. *Id.* ¶ 79.

the Amended Complaint, the City of Hartford and HPD leaders "deliberately chose not to implement the recommended reforms or take other necessary corrective action." *Id*. In particular, the Amended Complaint alleges that following the audit, "[t]he City failed to adopt policies requiring disclosure of exculpatory evidence, to adequately train and supervise officers on their *Brady* obligations, or to meaningfully investigate and discipline officers who commit such violations." *Id.*

A plaintiff "may adequately plead the existence of de facto customs or policies based on governmental reports documenting constitutional deficiencies or misconduct," *Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018) (collecting cases), if such reports are "sufficiently connected to the specific facts of the case," *Gomez v. City of New York*, No. 16-CV-1274 (NGG) (LB), 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017). Courts have recognized that allegations relating to failure to investigate civilian complaints and dysfunction in a police department's internal affairs division can support a *Monell* claim. *See, e.g.*, *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.") (citations omitted); *Ricciuti*, 941 F.2d at 123 ("The inference that a policy existed may . . . be drawn from circumstantial proof, such as . . . evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights.") (citation omitted); *Est. of Roman v. City of Newark*, 914 F.3d 789, 800 (3d Cir.

2019) (reversing district court's dismissal of *Monell* claim where complaint included allegations that policymakers, *inter alia*, refused "to create a well-run Internal Affairs Department" and inadequately investigated citizens' complaints).

Here, the Amended Complaint does more than simply state in conclusory terms that policymakers acted with deliberate indifference. Instead, it points to the HPD's failure to take corrective action in the face of a 2011 audit that allegedly found widespread problems in the division responsible for investigating officer misconduct. Am. Compl. ¶ 68. The Amended Complaint alleges that although the audit identified that the HPD lacked a written policy and production protocol for *Brady* materials, the HPD failed to adopt such policies after the audit. *Id.* According to the Amended Complaint, following the audit, the HPD also failed to adequately train and supervise officers on their *Brady* obligations or to properly investigate and discipline officers who suppressed exculpatory evidence. *Id.* Notably, the 2011 audit was close in time to the arrest and prosecution of Williams, which occurred in 2013 and 2014. Policymakers surely know with "moral certainty" that officers will confront a situation where they possess exculpatory information about a defendant, and training and supervision is necessary for officers to understand their obligations. *See Jenkins*, 478 F.3d at 94. Moreover, in each instance where an officer suppresses material exculpatory evidence, a deprivation of a citizen's constitutional rights occurs. Here, Williams has also alleged a causal connection between the HPD's alleged failures and the violations in his own case.

In addition, Williams alleges that other individuals were wrongfully convicted because Hartford Police officers suppressed exculpatory evidence. Am. Compl. ¶ 2 (alleging that HPD's longstanding custom and practice of withholding exculpatory evidence has led to the wrongful conviction of "Donald Raynor, Miguel Roman, Alfred Swinton, Hubert Thompson,

Derrick Taylor, and James Tillman" as in each of these cases "HPD officers suppressed material evidence favorable to the accused, resulting in innocent men being sent to prison for crimes they did not commit").

Other courts in this District have denied motions to dismiss *Monell* claims where plaintiffs have paired allegations of multiple instances of police misconduct committed against them with allegations of misconduct in other cases. *See, e.g.*, *Tyus v. Newton*, No. 3:13-cv-1486 (SRU), 2015 WL 1471643, at *11 (D. Conn. Mar. 31, 2015) ("In view of the number of alleged unconstitutional traffic stops, searches, and arrests involving the plaintiff and at least one other individual prior to the incidents involving the plaintiff, I conclude that the plaintiff has alleged sufficient facts to state a plausible claim that the City of New London had a custom or policy of tolerating police misconduct and acted with deliberate indifference by poorly training or supervising its officers regarding motor vehicle stops, detentions, pat-down and body cavity searches, and arrests."); *Goode v. Newton*, No. 3:12-cv-754 (JBA), 2013 WL 1087549, at *8 (D. Conn. Mar. 14, 2013) (denying motion to dismiss *Monell* claim where "Plaintiff allege[d] two separate violations—six months' apart—committed by New London officers" involving allegations of fabricated evidence, as well as an allegation of similar misconduct committed the previous year); *Moran v. Town of Greenwich*, No. 3:19-cv-722 (VAB), 2025 WL 579995, at *17 (D. Conn. Feb. 21, 2025) (stating that "[a]lthough there is a significant length of time between these alleged incidents and Mr. Moran's, there are enough similarities between these incidents and the alleged fabrication of evidence here, including that, in his case, several officers fabricated evidence, to make this a close question. . . . As a result, rather than resolve the claim at this stage definitively, the Court will exercise its 'inherent authority to manage [its] docket[ ] . . . with a view toward the efficient and expedient

resolution of cases,' and resolve it, to the extent necessary, after the close of discovery, and

the filing of a motion for summary judgment") (citation omitted); *see also DiPippo v. Cnty. of*

*Putnam*, No. 17-cv-7948 (NSR), 2019 WL 1004152, at *10 (S.D.N.Y. Feb. 28, 2019) (noting

"numerous examples from within the Second Circuit in which the district court allowed a

*Monell* claim to survive where the Plaintiff alleged only a few examples of similar

misconduct") (collecting cases).

The City of Hartford argues that Williams has not supplied sufficient details about these

other cases involving alleged *Brady* violations for them to support his *Monell* claim. ECF No.

33, at 4; ECF No. 39, at 3. Although the Amended Complaint does not say when these other

individuals were convicted or when the convictions were invalidated, I can take judicial notice

of these dates.[15] The convictions in several of the cases occurred more than a decade before

Williams' conviction. However, in some of the cases, the convictions were set aside closer in

time to the alleged misconduct in Williams' case. To the extent that the HPD took no corrective

action after *Brady* violations in particular cases, these examples may support Williams' *Monell*

---

[15] James Tillman was convicted in 1989; his convictions were vacated in 2006. *See State v. Tillman*, 600 A.2d 738 (Conn. 1991); H.B. 6673, 2007 Leg. (Conn. 2007). Miguel Roman was convicted in 1990; his convictions were vacated in 2009. *See State v. Roman*, 616 A.2d 266 (Conn. 1992); *Roman v. Hartford et al*, No. 3:11-cv-00491-JBA, ECF No. 1 ¶ 1; *see also State v. Miranda*, 75 A.3d 742, 747 (Conn. App. 2013). Derrick Taylor was convicted in 1995. *Taylor v. Lantz*, 20 A.3d 88 (Conn. App. 2011). According to the Conviction Integrity Unit of the Connecticut's Division of Criminal Justice, Taylor was released in 2023 following a sentence modification to time served. *See* Conviction Integrity Unit, Annual Report (2023), https://portal.ct.gov/gaming/-/media/dcj/ciu-annualreport2023.pdf?rev=89ef5c3fd3154183b5107aaef7727152&hash=1B8E49CADB78FF620D1ADCBED7E38893. Hubert Thompson was convicted in 1998; his convictions were set aside in 2012. *Thompson v. Rovella*, No. 3:15-CV-01742-VLB, 2017 WL 601399 (D. Conn. 2017). Alfred Swinton was convicted in 2001; his convictions were vacated in 2017. *See State v. Swinton*, 847 A.2d 921 (Conn. 2004); *Alfred Swinton*, File No. 25253 (Dec. 13, 2020), https://prod-portal-occct.ecourt.com/public-portal/?q=node/403 (claim commissioner award). Donald Raynor was convicted in 2015 and a retrial ordered in 2020. *State v. Raynor*, 254 A.3d 874, 882 (Conn. 2020).

claim. The Amended Complaint does not provide specific details about when policymakers had knowledge or constructive knowledge of the violations in these particular cases but alleges generally: "The City of Hartford and HPD policymakers have long been on actual notice of this pattern and practice of *Brady* violations by Hartford police, but have deliberately failed to take any meaningful corrective action." Am. Compl. ¶ 3.

I will note that in attempting to identify other instances of *Brady* violations, plaintiffs face particular challenges given that this form of misconduct involves, by definition, suppression of evidence. Victims of *Brady* violations may not even know that exculpatory information was withheld from them. In contrast, victims of other forms of police misconduct, such as the use of excessive force, will be aware that the violation has occurred.

In the context of *Brady* violations and police departments, the First and Fourth Circuits reversed district court decisions granting motions to dismiss *Monell* claims where complaints referenced but did not describe in detail other instances of misconduct. *See Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 403 (4th Cir. 2014) (holding that plaintiff stated a plausible *Monell* claim against Baltimore City Police Department relating to suppression of exculpatory evidence, noting that plaintiff "alleged facts—the existence of 'reported and unreported cases' and numerous 'successful motions'—which, if true, would buttress his legal conclusion"); *Haley v. City of Bos.*, 657 F.3d 39, 53 (1st Cir. 2011) (holding that the plaintiff had stated a plausible *Monell* claim against the Boston Police Department in view of the

"wholly unexplained" nature of its officers' suppression of evidence and the alleged "volume of cases" involving similar violations in the department).[16]

At this stage of the case, Williams is not required to establish a *Monell* violation but must merely state a "plausible" claim for relief. I conclude the Amended Complaint meets that requirement here given Williams' allegations relating to the 2011 audit and the HPD's inadequate response to it, the multiple instances of misconduct alleged in Williams' own case that involved multiple officers (including a supervisor), and, to a lesser extent,[17] Williams' allegations that others were wrongfully convicted based on the suppression of exculpatory evidence by HPD officers. *See Galveston,* 800 F. Supp. 2d at 842 (stating that factual allegations providing adequate notice to defendants of a *Monell* claim might include "past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy"). At the summary judgment stage, Williams' burden will be much higher. *See Owens*, 767 F.3d at 404 ("Of

---

[16] Other courts have required greater factual specificity when plaintiffs rely on other instances of misconduct to support *Monell* claims, even at the motion to dismiss stage. *See, e.g.*, *Buari v. City of New York*, 530 F. Supp. 3d 356, 399 (S.D.N.Y. 2021) (stating, in case involving *Brady* violation, that a plaintiff may cite to complaints in other cases to support a *Monell* claim but "[s]uch complaints must involve factually similar misconduct, be contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability"). Some courts do not require a showing of an adjudication of liability regarding other incidents at the motion to dismiss stage. *See, e.g.*, *Bagos v. City of Vallejo*, No. 2:20-cv-00185-KJM-AC, 2020 WL 6043949, at *5 (E.D. Cal. Oct. 13, 2020) ("Prior incidents involving lawsuits alone, even those which do not result in a finding or admission of wrongdoing, can be sufficient for *Monell* liability purposes in the face of a motion to dismiss.").

[17] I place more limited weight on the allegations relating to other cases given the Amended Complaint does not provide much information about the cases, including when policymakers had knowledge or constructive knowledge of the alleged *Brady* violations in these cases.

course, to prevail on the merits, [the plaintiff] will have to do more than *allege* a pervasive practice of BCPD misconduct; he must *prove it*.").

### F.    Count 9

In Count 7,[18] the Amended Complaint asserts that the Individual Defendants acted negligently by failing to disclose exculpatory information, failing to intervene to prevent other officers from failing to disclose exculpatory information, and suppressing exculpatory information. Count 9 alleges that the City of Hartford is liable under Conn. Gen. Stat. § 52-577n for the negligent actions of the Individual Defendants because they were acting in the performance of their duties within the scope of their employment. Counts 7 and 9 allege further that Willims was a readily identifiable person likely to suffer imminent harm from a breach of these duties. Defendants respond that there is no recognized cause of action for negligent failure to disclose exculpatory information; that Williams appears to be alleging deliberate indifference, recklessness, and willfulness, which are barred under § 52-577n(a)(2)(A); that any claim of negligence under § 52-577n is barred by governmental discretionary immunity; and that Williams' claims do not fall into any recognized exception. ECF No. 29-1, at 28-33. Williams responds that these arguments are "premature," and that governmental immunity either does not apply or that Williams falls into an exception to that immunity. ECF No. 38, at 14-15.

First, Connecticut law permits claims of negligence against police officers in some circumstances. *See Bussolari v. City of Hartford*, No. 3:14-cv-00149 (JAM), 2016 WL

---

[18] The Individual Defendants are named in Count 7 but do not assert a specific challenge to Count 7. The Individual Defendants maintain that the entire action should be dismissed based on unclean hands and res judicata. *See* ECF No. 34.

4272419, at *3 (D. Conn. Aug. 12, 2016). And courts in this district have found that police officers have a duty to disclose exculpatory evidence. *See Birch*, 2021 WL 4932405, at *17 (finding plaintiff's allegations that defendants owed plaintiff a duty to "reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence and pursuing criminal prosecutions without sufficient basis" were "sufficient to state a claim for negligent conduct, including [defendant's] alleged failure to disclose exculpatory evidence."); *Nealy v. State*, No. 9501283988, 1997 WL 600159, at *2 (Conn. Super. Ct. Sept. 18, 1997) (rejecting argument that plaintiffs had improperly advanced a claim of "negligent investigation" because the complaint specifically "alleg[ed] that the plaintiff's losses and injuries were caused by the 'negligence or carelessness' of the two state troopers in certain stated respects"). I therefore conclude that at the motion to dismiss stage, Williams has stated a plausible negligence claim against Defendants for failure to disclose exculpatory evidence. Thus, 9 should not be dismissed on that basis.

Second, at this stage of the case, Williams is not barred by Conn. Gen. Stat. § 52–557n from pursuing his claim against the City of Hartford in Count 9 based on negligent failure to disclosure exculpatory evidence by the Individual Defendants. "Connecticut General Statutes § 52–557n confers immunity from suit on public officials for certain activities." *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 366 (D. Conn. 2008). Conn. Gen. Stat. § 52–557n "provides that a municipality may be liable for damages caused by the negligent act or omission of an employee acting within the scope of employment *except* (1) where the act or omission required the employee's exercise of discretion 'as an official function of the authority expressly or impliedly granted by law' or (2) where the act or omission 'constitute[s] criminal conduct, fraud, actual malice or willful

misconduct.'" *Condon v. Town of Brookfield*, 747 F. Supp. 3d 354, 369 (D. Conn. 2024) (quoting Conn. Gen. Stat. § 52-557n(a)(2)).

The exclusion under § 52-557n(a)(2)(A) for "willful misconduct" does not require dismissal of Count 9. The fact that some counts in the Amended Complaint allege intentional misconduct does not prevent Williams from pleading in the alternative in Count 9 that Defendants' conduct was negligent. In addition, I conclude that it is premature at this stage of the case to determine whether Individual Defendants were acting pursuant to a discretionary or ministerial function when they allegedly suppressed exculpatory evidence and, if their acts were discretionary, whether an exception to government immunity applies.

The Connecticut Supreme Court has explained that there is "a difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions." *Daley v. Kashmanian*, 280 A.3d 68, 78, 480 (Conn. 2022). In particular, "[a] ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done." *Id.* In contrast, "when an official has a general duty to perform a certain act, but there is no city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government official to act in a] prescribed manner, the duty is deemed discretionary." *Id.* (alterations in original).

In *Horn v. City of New Haven*, No. 3:18-cv-1502 (RNC), 2024 WL 1342762, at *6 (D. Conn. Mar. 29, 2024), at the summary judgment stage, the Court held that the duty of police to disclosure exculpatory evidence to prosecutors, as required by Conn. Gen. Stat. § 54-86c(c), imposed a discretionary rather than ministerial duty. However, given the factual circumstances surrounding the alleged suppression of exculpatory evidence have not been developed at this

motion to dismiss stage of the case, I conclude it is premature to determine if the function is discretionary or ministerial. Similarly, I determine it is premature to determine if the "imminent harm" exception to governmental immunity for discretionary acts applies.[19] *See Horn*, 2024 WL 1342762, at *8-9 (stating that court could not "exclude the possibility that the [Connecticut Supreme] Court would be willing to permit use of the [imminent harm] exception if the facts of a given case demanded it" and concluding that "that a ruling on the legal sufficiency of the negligence claims based on the defendants' post-conviction acts and omissions should be deferred at least until the presentation of the plaintiffs' case at trial"); *Dipane-Saleem v. Gallagher*, No. 3:15-cv-596 (MPS), 2016 WL 1060190, at *8 (D. Conn. Mar. 15, 2016) (denying motion to dismiss based on discretionary act immunity, concluding that plaintiff had adequately alleged the identifiable victim/imminent harm exception applied where she alleged that police falsely accused her of forgery and presented a misleading and incomplete arrest warrant to the judge).[20]

I therefore decline to dismiss Count 9 at this stage of the litigation.

---

[19] When relying on imminent harm exception to governmental immunity under Connecticut law, a plaintiff must demonstrate that (1) he was an identifiable person and was subject to imminent harm, (2) that a public officer's conduct subjected him to that harm, and (3) that the officer did so despite the apparent likelihood of harm. *Belanger*, 578 F. Supp. 2d at 367.

[20] Defendants assert that "it appears that the type of harm required is physical harm or personal danger" for the imminent harm exception rather than the danger of wrongful conviction at issue here. ECF No. 29-1, at 34 (quoting *Chipperini v. Crandall*, 253 F. Supp. 2d 301, 312 (D. Conn. 2003). Williams observed at oral argument that he did experience physical harm in prison. As noted, the facts are not sufficiently developed at this stage of the case to determine the applicability of this exception.

## IV.    <u>CONCLUSION</u>

As noted above, Williams voluntarily dismissed Counts 5 and 8 at oral argument. For the foregoing reasons, I deny Defendants' Motion to Dismiss the remaining counts.

**SO ORDERED.**

New Haven, Connecticut
February 5, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge